EDWARDS ANGELL PALMER & DODGE LLP
Rory J. McEvoy (RM-1327)
Attorneys for Defendants
THE ST. LUKE'S ROOSEVELT HOSPITAL CENTER,
THE ADDICTION INSTITUTE OF NEW YORK and
CONTINUUM HEALTH PARTNERS, INC.
750 Lexington Avenue
New York, New York 10022-1200
(212) 308-4411

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHARLOTTE NUGENT,

            Plaintiff,

-against-

THE ST. LUKE'S ROOSEVELT HOSPITAL
CENTER, THE ADDICTION INSTITUTE OF
NEW YORK (formerly known as the SMITHERS
ALCOHOLISM TREATMENT AND TRAINING
CENTER), its predecessors and successors,
CONTINUUM HEALTH PARTNERS, INC. AND
KEVIN HEANEY, individually and in official
capacity, and John Does 1-10,

            Defendants.

05 Civ. 5109 (RPP)

**RULE 56.1 STATEMENT**

---

In accordance with Rule 56.1 of the Local Civil Rules of this Court, Defendants St. Luke's/Roosevelt Hospital Center ("SLRHC"), The Addiction Institute of New York ("AINY") and Continuum Health Partners, Inc. ("Continuum") submit the following statement of material facts not in dispute.

1.      Continuum is a holding company created for the purpose of serving as the parent for four hospitals in New York City, including SLRHC. (Meyer Decl. ¶¶ 2-3.)

2.      SLRHC has an uptown location, the St. Luke's site, at Amsterdam Avenue and 114th Street, and a downtown location, the Roosevelt site, at Tenth Avenue and 59th Street. (Pl. Tr. 29, 52, 68.)

3. At St. Luke's, the Trinity House program treats patients suffering from alcoholism and other substance abuse problems. (Pl. Tr. 12.)

4. At Roosevelt, the AINY treats patients with these problems. The AINY's Inpatient Rehabilitation Unit specializes in in-patient treatment. (Pl. Tr. 29, 58-59, 69.)

5. In June 1989, Nugent, whose date of birth is September 23, 1941, was hired by SLRHC where she worked as a Social Worker in Trinity House. (Pl. Tr. 32, 36, 50-52.)

6. In October 1999, Nugent transferred to AINY's Inpatient Rehabilitation Unit, where she worked as a Social Worker until she voluntarily retired in November 2003. (Pl. Tr. 51-52, 326-27, 333, 471.)

7. In 1990, Nugent diagnosed with ADHD. (Pl. Tr. 21-22.)

8. Plaintiff claims that ADHD affects her ability to organize tasks, manage her time and complete detail work. (Pl. Tr. 21, 397.)

9. Since 1998, Nugent has taken Ritalin and BuSpar, which work "very well" and "drastically" improve her symptoms. (Pl. Tr. 7, 22-24.)

10. Nugent admits that "ADD does not interfere with activities of daily living," such as dressing, bathing, preparing meals and grocery shopping. (Pl. Tr. 394-96.)

11. At work, Plaintiff uses a planner and calendar to meet deadlines and organize tasks. (Pl. Tr. 42-45.)

12. The use of a planner and calendar allowed Nugent to "keep up with" due dates for reports and other duties. *Id.*

13. In October 1999, Plaintiff applied for a transfer to AINY. Prior to her transfer, Nugent interviewed with Heaney, Director Of Inpatient Rehabilitation, and Jeff Foote, Ph.D. ("Foote"), Clinical Director of AINY. (Pl. Tr. 52-56; Heaney Tr. 6-7.)

14. At the time, Heaney, whose date of birth is September 7, 1952, supervised a staff of eight alcoholism counselors and one social worker. (Pl. Tr. 63; Heaney Tr. 4.)

15. The unit also included about ten nurses who reported to Aileen Clucas ("Clucas"), Nursing Clinical Coordinator for the Inpatient Unit. (Pl. Tr. 63-64; Clucas Tr. 4-5; Heaney Tr. 5-6.)

16. Heaney made the decision to hire Plaintiff, who was 58 years old, for the social work position at AINY. (Pl. Tr. 394; Heaney Tr. 6-7.)

17. At AINY, Plaintiff counseled and treated alcoholism and substance abuse patients. (Pl. Tr. 59.)

18. Among her duties, Plaintiff (i) attended daily staff meetings with Heaney, counselors and nurses, (ii) led group therapy sessions, (iii) devised treatment plans, (iv) made weekly notes in patients' charts, (v) documented the discharge or transfer of patients and (vi) completed ASIS forms, required by the New York State Office Of Alcoholism and Substance Abuse Services ("OASAS"), to track substance abuse patients. (Pl. Tr. 73-75; Heaney Tr. 49, 72.)

19. Plaintiff also led counseling sessions with patients and their families. (Pl. Tr. 69-70, 521; Heaney Tr. 38.)

20. In the view of a number of co-workers and subordinates, Heaney had a rigid management style and was a disciplinarian with patients. (Clucas Tr. 18-19.)

21. Heaney at times was difficult to work with. (Clucas Tr. 18.)

3

22. Heaney made efforts to improve his relationship with the staff. In March 2000, Heaney met with three AINY nurses to discuss improving his interactions with the nurses and to apologize to one of the nurses for any past miscommunications. (Clucas Tr. 26; Heaney Tr. 14-15.)

23. At the meeting, the nurse did not accept Heaney's apology, he became frustrated with her refusal to do so and slapped his hand on the arm of his chair. (Heaney Tr. 14; Clucas Tr. 26-27.)

24. The nurses complained about Heaney's conduct. After an investigation, Heaney received a written warning for "intimidating and unprofessional" conduct. (Heaney Tr. 12, 14, 16, Ex. 1.)

25. Following his receipt of the warning, Heaney met with the AINY staff to apologize for the incident. (Heaney Tr. 28.)

26. There was no repetition of this behavior by Heaney. (Clucas Tr. 29.)

27. On two prior occasions, Heaney slapped a table after staff members (both male and female) were late arriving for a meeting and during an interaction with a nurse. (Heaney Tr. 102; Pl. Tr. 107-8.)

28. Due to Nugent's family counseling duties, she was given a reduced patient caseload. (Pl. Tr. 525; Heaney Tr. 37-39.)

29. Nugent's family counseling duties resulted in alcoholism counselors treating more patients than Nugent. *Id.*

30. In May 2000, the unit stopped offering family counseling due to a lack of adequate staffing to treat the high number of patients. (Pl. Tr. 55, 548.)

4

31. To equalize the work in the unit, Nugent's caseload was increased to the level of the Alcoholism Counselors. (Pl. Tr. 281.)

32. In Spring 2000, Heaney referred to two female patients as "cunts." (Pl. Tr. 89-93; Heaney Tr. 26-27.)

33. Later in 2000, during one of Heaney's supervisory meetings with Plaintiff, he referred to Clucas as a "radical lesbian." (Pl. Tr. 84-89; 94-97; Heaney Tr. 23.)

34. Heaney never said "cunt" or "radical lesbian" on any other occasion between 2000 and her retirement in November 2003 – a time period of more than three years. (Pl. Tr. 235, 579.)

35. Plaintiff claims that, "long[]" after she complained to Foote, Heaney referred to a patient as a "whore." (Pl. Tr. 97-98.)

36. Heaney does not recall this statement and Nugent never reported it to anyone at SLRHC. (Pl. Tr. 102; Heaney Tr. 26-27.)

37. This is the only time that Plaintiff claims that Heaney called anyone a "whore." (Pl. Tr. 102.)

38. Heaney never called Plaintiff a "cunt," "radical lesbian" or "whore" and did not recall him making any other derogatory comments about women. (Pl. Tr. 92, 110, 236.)

39. In October 2000, Plaintiff complained to Foote about the comments by Heaney. (Pl. Tr. 84-85, 89-91, 123-124; Heaney Tr. 23.)

40. In a memorandum to Clucas, dated November 28, 2000, Plaintiff said that Heaney made "sexist and derogatory" statements about "a patient" and "a senior staff person." (Pl. Tr. 131-133; Ex. G.)

5

41. Foote investigated Nugent's complaint and, at its conclusion, met with Heaney, Nugent and a unit nurse, Cindy Range ("Range"). At the meeting, Foote told Heaney that his behavior was unacceptable and a "contrite" Heaney apologized. (Pl. Tr. 275, 575-76; Heaney Tr. 20-22.)

42. The week after the meeting, Heaney personally apologized to Clucas for his comment about her. (Heaney Tr. 23-24, 26, 28-29; Clucas Tr. 13.)

43. For nearly a year after Plaintiff complained about Heaney, from November 2000 to September 2001, she did not receive any written criticism of her performance, any disciplinary actions or any verbal criticism from Heaney. (Pl. Tr. 158-59.)

44. By Plaintiff's own account, the period between November 2000 and September 11, 2001 was "quiet" with regard to Heaney. (Pl. Tr. 542-46.)

45. On September 11, 2001, Plaintiff was scheduled to work from 8:00 a.m. to 7:00 p.m. (Pl. Tr. 160; Heaney Tr. 93.)

46. Shortly after the attacks on the World Trade Center, SLRHC implemented its disaster plans. (Horowitz Tr. 24.)

47. Expecting victims of the attacks to be brought to SLRHC, and anticipating the need for the services of counselors and social workers, Heaney instructed the entire staff, including Nugent, to remain on duty until they received permission to leave. (Heaney Tr. 91-92.)

48. At approximately 3:30 p.m., Plaintiff left work and went home. (Pl. Tr. 162, 164; Heaney Tr. 90.)

49. Plaintiff did not look for or try to page Heaney to ask for permission to leave. (Pl. Tr. 166-67, 707.)

50. After she left work, Plaintiff called and left a voicemail message for Heaney informing him that she had gone home. (Pl. Tr. 167.)

51. Nugent was the only staff member who left work early that day. The rest of the staff remained on duty until Heaney told them they could leave. (Heaney Tr. 92-93.)

52. On September 13, 2001, Heaney informed Gerald Horowitz ("Horowitz"), AINY Administrator, that Nugent went home on September 11 without permission. (Horowitz Tr. 25.)

53. Horowitz met with Plaintiff and Heaney to discuss this incident. (Horowitz Tr. 25.)

54. During the meeting, Plaintiff admitted that she left work on September 11 at 3:30 p.m. and that leaving without permission was wrong. (Pl. Tr. 175; Horowitz Tr. 25.)

55. Plaintiff's excuse for leaving early was that her husband was upset because he had not heard from two friends who worked in the World Trade Center. (Pl. Tr. 163-64.)

56. The only discipline that Heaney and Horowitz decided to impose on Plaintiff's was to dock her pay for the 2.5 hours she missed on September 11, to send her home early on September 13 and to not pay her for the remainder of that day. (Pl. Tr. 176-77; Horowitz Tr. 26.)

7

57. Plaintiff's union grieved the decision to dock Nugent's pay and the Hospital agreed to reimburse her for the 3.5 hours of pay that she lost on September 13 but not to reimburse her for the time that she missed on September 11. (Pl. Tr. 179-81, Ex. H.)

58. Nugent believed this was a "fair resolution" because "obviously [she] did leave without authorization." (Pl. Tr. 183.)

59. Between September 11, 2001 and June 4, 2002, Heaney did not make any derogatory comments to or about her and did not make any negative comments about any female staff member or patient. (Pl. Tr. 184-86.)

60. Plaintiff could not recall being harassed by Heaney during this period. (Pl. Tr. 197.)

61. On May 1, 2002, Plaintiff received a verbal warning for a variety of errors. A review of Plaintiff's charts revealed that progress notes were missing for six patients. (Pl. Tr. 188, Ex. J.) Plaintiff also failed to follow a psychiatrist's instructions to arrange follow up treatment for a discharged patient. (*Id.*) Similarly, she did not comply with Heaney's request that she complete the paperwork to discharge a patient. (*Id.*)

62. On May 24, 2002, Plaintiff was scheduled to lecture patients at 8:45 a.m., but she failed to arrive for the lecture until after 9:15 a.m. (Pl. Tr. 218, 221, Ex. R.)

63. As a result of her lateness, more than forty AINY patients were left unattended for thirty minutes. (*Id.*)

64. On June 4, 2002, Nugent did not arrive on time for work at 8:00 a.m. More than an hour later, Nugent telephoned Heaney to tell him she would be late. This

8

conduct violated SLRHC policy that requires notice at least one hour before the start of the shift. (Pl. Tr. 218-22, Ex R.)

65. On June 4, 2002, Plaintiff applied for and was granted a medical leave of absence ("LOA") from June 6 to September 6, 2002. (Pl. Tr. 208.)

66. Plaintiff sought an LOA because, according to her psychiatrist, she suffered from "depression and anxiety." (Pl. Tr. 203, Ex. L.)

67. At the conclusion of her leave, Nugent did not return to work, as scheduled, and did not notify SLRHC that she would not be returning to work. (Pl. Tr. 210.)

68. On September 9, 2002, Heaney sent Plaintiff a letter via Federal Express regarding her failure to return to work and enclosed a leave extension form. (Pl. Tr. 209-10, Ex. O.)

69. On September 16, 2002, Plaintiff filed an application (which was granted) to extend her LOA to September 23, 2002. (Pl. Tr. 211, Ex. P.)

70. On September 24, 2002, Plaintiff received a written warning for the May 24 and June 4 incidents. (Pl. Tr. 216-17.)

71. Plaintiff also was warned for her failure to process ten patient discharge forms, resulting in cases being listed in the State registry of substance abuse patients for between five and twenty months after the conclusion of treatment. (Pl. Tr. 220, Ex. R.)

72. During her LOA, Heaney reorganized Plaintiff's responsibilities to reduce the amount of paperwork that she was responsible for, but had trouble, completing. (Heaney Tr. 55-56.)

73. Nugent's job responsibilities were changed to allow her to focus on assessing of new patients. (Pl. Tr. 230, Ex. S.)

74. In this role, Nugent met with new patients, reviewed their self-report questionnaire, completed an assessment summary and determined the patient's problem areas. (Pl. Tr. 230, Ex. S.)

75. Plaintiff considered these new responsibilities to be an "upgrade" in her job and she was happy to perform these functions because she "liked it a lot." (Pl. Tr. 230-31.)

76. On December 24, 2002, Plaintiff was scheduled to lead a weekly community meeting. (Pl. Tr. 236-37.)

77. Nugent failed to attend the meeting because she was Christmas shopping. (Pl. Tr. 236.)

78. Paul Phillipe, Nursing Care Coordinator, tried to find Nugent by telephone, by paging her and by going to her office. He only learned her whereabouts after she telephoned him to apologize for missing the meeting. (Pl. Tr. 237, Ex. T.)

79. As a result of this incident, on January 10, 2003, Plaintiff received a one-day suspension. (Pl. Tr. 237-38, Ex. T.)

80. Plaintiff was put on notice that "[y]our failure to make changes in your work performance will result in further disciplinary action, up to, and including termination of your employment." *Id.*

81. Plaintiff admits that she should have been disciplined for missing the meeting and does not think that a one-day suspension was "inappropriate." (Pl. Tr. 238.)

82. In the three months after her one-day suspension, Nugent's performance did not improve to a satisfactorily level. Plaintiff continued to be untimely in attending clinical activities, including team rounds and community meetings, engaged in unprofessional behavior at staff meetings, including reading the newspaper and filing her nails, and failed to arrive on time for her treatment groups -- all of which Nugent freely admits doing. (Pl. Tr. 253-55.)

83. Heaney decided not to discharge or take any disciplinary action against Nugent. On April 3, 2003, Heaney and Paul Rinaldi ("Rinaldi"), who replaced Foote after he left AINY, met with Nugent to discuss these problems with her performance. (Pl. Tr. 245, Ex. U; Heaney Tr. 9-10.)

84. At the conclusion of the meeting, Heaney gave Nugent yet another opportunity to improve her job performance to a satisfactory level. (Pl. Tr. 245, 254-56, Ex. U; Heaney Tr. 66.)

85. The day after the meeting, Nugent sought (and was granted) an LOA from April 4 to June 4, 2003. (Pl. Tr. 311, Ex. X.)

86. Plaintiff applied for this leave because she believed that she would be fired if she did "one more thing" wrong, even though she was told at the June 3 meeting that she still had the opportunity to improve. (Pl. Tr. 309.)

87. Nugent's fear was based on rumors and gossip: what other employees said they "heard" and repeated to her. *Id.*

88. The absence of any medical reason for this second LOA is confirmed by Plaintiff's admission that she would have returned to work, if she were transferred to a job that did not report to Heaney. (Pl. Tr. 320.)

89. On May 29, 2003, having been unsuccessful in her efforts to secure a transfer, Nugent obtained an extension of her LOA to August 4, 2003. Nugent admits that she had no intention of returning to work on August 4, unless she was able to transfer out of AINY. (Pl. Tr. 322.)

90. On July 7, 2003, Plaintiff submitted a Notice of Retirement, effective July 31, 2003, because "they weren't going to allow me to transfer to another unit" and to protect "my benefits." (Pl. Tr. 323-25, Ex. BB.)

91. On October 9, 2003, Nugent submitted a handwritten letter postponing her retirement until November 1, 2003. (Pl. Tr. 326, Ex. CC.)

92. From the time that she worked at Trinity House, Plaintiff treated patients in her own private practice. (Pl. Tr. 651.)

93. After she retired, the number of Nugent's private patients grew from 4 or 5 to between 10 and 15. (Pl. Tr. 336.)

94. Plaintiff performs "very well" in her practice, treating patients for depression, anxiety and ADHD. (Pl. Tr. 336-37, 443.)

95. Plaintiff offers psychotherapy and cognitive behavioral therapy to patients, which are "much more" sophisticated than the work that she performed at AINY. (Pl. Tr. 445, 447.)

96. To keep current with developments in her field, she attends continuing education classes, reads written materials and consults internet sources. (Pl. Tr. 447-50.)

97. Nugent is required to attend conferences to maintain her Credential On Alcoholism And Substance Abuse Counseling. (Pl. Tr. 451.)

98. Plaintiff has also given presentations on ADHD. (Pl. Tr. 452.)

99. Plaintiff claims that Heaney retaliated against her by (1) giving her dirty looks, (2) reducing her duties, (3) suspending her without pay for one day, and (4) giving her verbal and written warnings regarding her job performance. (Compl. ¶¶ 29; Pl. Tr. 198-99, 227, 244-45, 257-58, 283-84, 596.)

100. Nugent was employed by SLRHC and AINY was a division of the Hospital with no employees. (Horowitz Tr. 4.)

101. Continuum was never Plaintiff's employer and has only two employees. (Meyer Decl. ¶¶ 2-4.)

102. Nugent would have returned to work from her second LOA if she could have secured a transfer away from Heaney. (Pl. Tr. 320, 408.)

103. Nugent asked Heaney if she could bring in an ADHD expert on organizational problems to assist her. In response, Heaney said "That would be great." (Pl. Tr. 295-96, 729.)

104. Although Nugent spoke to the expert, she did not follow up with Heaney and made no attempt to arrange for the expert to come to AINY. (Pl. Tr. 296-97.)

105. Heaney allegedly discriminated only against "older woman that might look like somewhat of a maternal figure, mostly anybody whom he crosses swords with." (Pl. Tr. 390-91.)

106. Plaintiff described Range and Jenny Pagan ("Pagan") as among Heaney's "pets" in the department. (Pl. Tr. 294.)

107. Nugent testified that Heaney "constantly denigrated" John Taylor, the head of AINY's Intake Unit and staff psychologist Andrew Merling, and that Heaney terminated two male staff members due to difficulty with paperwork. (Pl. Tr. 142, 582.)

108. Although Plaintiff points to two male alcoholism counselors, Albert Jackson ("Jackson") and Kenneth Lewis, who she claims received preferential treatment from Heaney, Nugent admitted that she was unaware if they engaged in the same conduct that resulted in her being disciplined and that it was her "perception" that they were treated better than she was by Heaney. (Pl. Tr. 502-03.)

109. In her Complaint, Plaintiff alleged that at AINY "women were rarely promoted" and "were terminated or suspended . . . more frequently . . . than men." (Compl. ¶ 20.)

110. At deposition, Nugent saidthat she did know any women who applied for promotions and that the basis for her belief that women were disciplined more often than men was based on rumors. (Pl. Tr. 345-52.)

111. Plaintiff age claim is based on her "impression" and she has "no facts to back it up." (Pl. Tr. 375.)

112. Heaney, nor anyone else, at AINY ever made any age-related comments. (Pl. Tr. 387-88.)

113. Plaintiff testified that Heaney had a "cozy relationship" with Range, who is only two years younger than Nugent, and with Pagan, who was in her 50's. (Pl. Tr. 461, 464.)

114. Another of Heaney's "favorites," Jackson, was in his late 40's. (Pl. Tr. 142.)

115. Although Plaintiff alleged that females over the age of 40 were disciplined more harshly and that younger women were treated differently than older women,

Plaintiff has no evidence to support these assertions. (*Compare* Compl. ¶ 20 with Pl. Tr. 384-86, 501.)

Date:  September 15, 2006
       New York, New York
       DODGE LLP

EDWARDS ANGELL PALMER &

By: _____
    Rory J. McEvoy (RM-1327)